## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PHILIP R. SHAWE and TRANSPERFECT
GLOBAL INC.,

        Plaintiffs,

v.

ANDRE G. BOUCHARD, ESQ., in his
Official capacity as Chancellor of the Court
of Chancery for the State of Delaware

        Defendant.

Case No.: 20-cv-1770 (MAK)

## FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Plaintiffs Philip R. Shawe ("Shawe") and TransPerfect Global, Inc. ("TPG")

hereby amend their complaint as a matter of course pursuant to FRCP 15(a)(1)(B)

and as and for their First Amended Complaint allege as follows:

## INTRODUCTION

1.　　This action was filed for declaratory relief to redress and avoid

violations of TPG's and Shawe's First and Fourteenth Amendment rights, including

their rights of free speech, to petition government for redress of grievances, and for

violations of due process, resulting from unconstitutional conditions imposed upon

the Plaintiffs in non-final, non-appealable gag orders issued by the Defendant on

November 1, 2019 (the "Nov. 1 Orders") in an underlying matter in the Court of Chancery in the State of Delaware (the "State Court Action").

2.     Shortly after receiving the original complaint in this action, Defendant attempted to render the complaint moot by making a series of interlocutory, non-final rulings designed to give the appearance of remedying the unconstitutional conduct.  The rulings did lift the gag order and *partially* reduced the veil of secrecy that has been cloaking certain of the billing information of the multi-million dollar fees that the Court-appointed Custodian and state actor Robert Pincus ("Pincus" or the "Custodian") seeks to charge against Plaintiffs.  However, the Defendant also included self-serving findings that his unconstitutional conduct and now rescinded orders were at all times, and remain, proper, the confidentiality provisions having only been rescinded as a practical matter apparently unrelated to Plaintiffs' constitutional challenges.

3.     Unsurprisingly, even after these rulings, Pincus continues to assert that the Nov. 1 Orders allow the Custodian to redact non-confidential information from legal bills (*e.g.*, the identity of timekeepers or any "sensitive" information that might embarrass the Custodian's law firm), thereby prejudicing Plaintiffs' ability to fully exercising their rights to comment on and object to Pincus' improperly inflated fee demands.

4.     Moreover, although Plaintiffs were unable to participate in previously filed, but still pending fee objections (other than by surrendering their First Amendment rights), after Defendant finally lifted his unconstitutional gag orders, and allowed Plaintiffs to review the bills, Defendant denied Plaintiffs' motion to allow Plaintiffs an opportunity to supplement their objections, an implicit determination that the prior orders—orders preventing Plaintiffs from any and all personal participation in those objections—had not inhibited their ability to participate in the objections.  At the same time, Defendant is pushing forward on motions for fees sought by Pincus for legal work allegedly performed to secure and defend the unconstitutional gag order (the "Gag Order Fee Petitions").

5.     Since the beginning of the State Court Action, the Defendant has awarded state actor Pincus, without exception and without ever even seeing any time entries, every penny of the more than $14,000,000 in fees requested.  Without a declaration from this Court that the gag order was a violation of TPG's and Shawe's civil rights, the Defendant will award over $450,000 in fees claimed by Pincus for acting unconstitutionally as a state actor and officer of the court, and cause Plaintiffs to suffer further injury that is directly attributable to the unconstitutional conduct.  Additionally, Plaintiffs continue to suffer ongoing injury because the deadlines arbitrarily imposed by Defendant require them to continue to expend fees to make their severely disadvantaged attempts to object to the Gag Order Fee

Petitions.  This First Amended Complaint seeks to address the ongoing and unremedied injury and prejudice incurred as a direct result of Defendant's violation of Plaintiffs' civil rights.  The damage inflicted upon Plaintiffs by Defendant's civil rights violations have not remedied and Plaintiffs continue to have legally cognizable, redressable harms with real, concrete economic and other consequences.  These live issues, and Plaintiffs' personal stake in their ultimate disposition, prevent a determination of mootness.

## JURISDICTION

6.     Plaintiffs' claims are brought pursuant to 42 U.S.C. § 1983, as amended, for violations of the First and Fourteenth Amendments to the Constitution of the United States, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

7.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331 and 1343(a)(3), including because the challenged Delaware state court proceedings are ongoing, and the Delaware Supreme Court has held that the challenged chancery court orders are interlocutory, non-final orders. *See Malhan v. Secretary United States Department of State*, 938 F.3d 453 (3d Cir. 2019).

8.     There continues to be a live concrete controversy between the parties, and the case is not moot, as detailed, *infra,* paras. 2-5.

9.     The *Rooker-Feldman* doctrine is inapplicable here.  In *Malhan, the*

4

Third Circuit expressly held that *Rooker-Feldman* applied only to final state court judgments, and expressly rejected the position that *Rooker-Feldman* applied to non-final, interlocutory state court decisions, *Malhan*, 938 F.3d at 459-61, bringing the Circuit in line with six other Circuits that have addressed this issue. *Id*. at 459. In so limiting *Rooker-Feldman*, *Malhan* specifically criticized and rejected *Shawe v. Pincus*, 265 F. Supp. 3d 480 (D. Del. 2017), as wrongly applying the doctrine to a challenged state court interlocutory decision. *Id*. at 458.

10.    *Malhan* also explicitly followed the narrow application for *Younger* abstention that the Supreme Court had adopted in *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77-78 (2013). *Malhan*, 938 F.3d at 461-65.

11.    In its explicit adoption of the Supreme Court's narrow limitations on *Rooker-Feldman* and *Younger*, the Third Circuit emphasized that the federal courts in this Circuit must vindicate constitutional rights, including when there are related ongoing state court proceedings, underscoring that "federal courts have a 'virtually unflagging' duty to exercise jurisdiction conferred by Congress." *Malhan*, 938 F.3d at 458 (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976)); *id.* at 462, 465.

12.    Venue of this action is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), and (2), as Defendant resides in this District and a substantial part of the events giving rise to the claims herein occurred in this District.

13.     This Court has personal jurisdiction over Defendant, who resides is employed in, and is a citizen of, the State of Delaware, and where the unconstitutional actions upon which the claims herein arise occurred.

## PARTIES

14.     Plaintiff TPG is incorporated in the State of Nevada, and has its principal place of business in New York, New York.

15.     Plaintiff Shawe is the owner of 99% of TPG, and is the President and CEO and a director of TPG.  Prior to May 7, 2018, Shawe was a 49% owner of TPG.

16.     Defendant Andre G. Bouchard is the Chancellor of the Court of Chancery of the State of Delaware and is named as a defendant in his official capacity as Chancellor.  Chancellor Bouchard presided over the Court of Chancery actions originally between Shawe and Elizabeth Elting ("Elting"), previously a 50% owner of TPG, and currently presides over disputes in those actions between Shawe and TPG on one hand, and Pincus and Skadden on the other, giving rise to this suit, and has rendered all the Court of Chancery decisions referenced herein, including the unconstitutional interlocutory orders at issue herein.  Chancellor Bouchard was previously an attorney at Skadden Arps, Slate, Meagher & Flom LLP ("Skadden").

17.     Non-party Pincus is an attorney and formerly a partner in Skadden's Wilmington, Delaware office. Pincus was appointed by Defendant as the Custodian to conduct a Forced Sale of TPG (the "Forced Sale"), and to act as a tie-breaking

third director of TPG pending the Forced Sale, and who continues to charge TPG for services purportedly performed by himself and Skadden related to his court-appointed custodianship. Pincus is a state actor in all of his actions, conduct and statements concerning his dual roles as Custodian and Director of TPG, including in seeking fees for himself, Skadden and his many other advisers.

## FACTS

### TransPerfect Global, Inc.

18.    In 1992, Shawe and Elting co-founded the business that became TPG while graduate students at the Stern School of Business at New York University.

19.    TPG has grown to become the world's largest provider by revenue of translation, website localization, and litigation support services, with over 100 offices worldwide, more than 6000 full-time employees, and a global network of more than 5,000 professional linguists and subject-area specialists in approximately 170 languages.

20.    Shawe devoted the past 28 years of his life, since age 22, to building TPG into an extraordinarily successful, thriving, extremely profitable company, with revenues in excess of $760 million in 2019.

21.    The remaining 1% of TPG has long been owned, and is currently owned, by Shawe's mother, non-party Shirley Shawe.

### The Delaware State Court Litigation

22.     Commencing in approximately 2012, Shawe and Elting engaged in management disputes driven by Elting's increasing demands for substantially larger profit distributions and a buy-out of her interest in TPG from Shawe.

23.     On May 2014, Elting commenced an action in New York State Supreme Court, seeking to remove Shawe as an officer and director of TransPerfect Translations International, Inc. ("TPI"), a subsidiary of TPG and the New York operating company, and to dissolve TPI.   Elting's request for a preliminary injunction and dissolution was denied on August 4, 2014, with the Court finding that her disputes with Shawe amounted to "squabbles."

24.     The New York action was dismissed with prejudice by stipulation on November 20, 2018.

25.     On May 23, 2014, the day after Shawe filed an action in the Delaware Court of Chancery alleging, *inter alia*, Elting's breach of fiduciary duty and breach of contract, Elting filed a petition against the Shawes in the Court of Chancery that, after several amendments, sought the appointment of a custodian based on alleged director deadlock and to resolve alleged shareholder deadlock, and also sought an order to sell TPG, despite its substantial profitability.

26.     As discussed further below, the Defendant granted Elting's requested relief over the Shawes' objections and ordered the Forced Sale. *See In re Shawe & Elting LLC, et al.,* 2015 WL 4874733 (Del. Ch. Aug. 13, 2015).

8

## The Court's Appointment of the Custodian and the Forced Sale of TPG

27.    Also on August 13, 2015, the Defendant appointed Pincus "as a custodian to oversee a judicially ordered sale of the Company," including to "propose a plan of sale of the Company with a view toward maintaining the business as a going concern and maximizing value for the stockholders," and appointed him "to serve as a third director with the authority to vote on any matters on which Shawe and Elting cannot agree and which rise to the level that he deems to be significant to managing the Company's business and affairs." *Id.* at *32.

28.    The Order appointing Pincus as Custodian expressly limited reimbursement of counsel to "reasonable" fees and expenses:

> 10.   The Custodian shall be compensated at the usual hourly rate he charges as a partner of Skadden. The Custodian also shall be reimbursed for reasonable travel and other expenses incurred in the performance of his duties. The Custodian shall petition the Court on a monthly basis, or such other interval as the Court may direct, for approval of fees and expenses. Any fees and expenses approved by the Court shall be paid promptly by TPG.
> The Custodian may retain counsel (including Skadden) or other advisors to assist him in the performance of his duties under this Order. The fees of any counsel or advisors so retained shall be calculated on the same hourly rates charged by such counsel or advisors to clients represented outside this matter. The *reasonable* fees and expenses of such counsel or advisors shall be paid promptly by TPG.

29.    *In re TransPerfect Global, Inc.*, 2015 WL 4778615, at *1-2 (Aug. 13, 2015) (emphasis added) ("Aug. 13 Order").

30.    The Aug. 13 Order expressly provided that *monthly status reports* on

9

the progress of the Forced Sale be filed confidentially.  However, that Order did not include any authorization to file the monthly *petitions for attorneys' fees and expenses* confidentially.  *Compare* Aug. 13 Order, ¶ 8 (Custodian "shall provide a report to the Court every thirty days after entry of this Order concerning the progress of his efforts. Such reports shall be filed under seal and be made available only to the Court and the parties and their counsel"), *with* ¶¶ 10, 11 (quoted in full, para. 28, *supra)*.  This language is consistent with general Delaware practice and law that billing information is not inherently or usually confidential.

31.    Skadden regularly submits public billing records when seeking fees and expenses in United States Bankruptcy Court proceedings.

32.    The Custodian filed *confidential* monthly petitions for attorneys' fees and costs on behalf of himself and his law firm, Skadden.  None of the fee petitions provided the slightest itemized detail or customary support for the sums sought, despite the Plaintiffs' demands for such information so they could review and potentially question or challenge any amounts that may have been charged in error, or that Plaintiffs believed were unreasonable or unjustified. Defendant almost immediately approved each and every petition in full, often within one day of submission and sometimes within hours, without ever requesting or requiring Skadden to provide him or the Plaintiffs with a more specific or detailed basis for the fee claims, or providing the Plaintiffs with an opportunity to object prior to

10

approval.   Despite the absence of court authority to do so, the Custodian's fee petitions have always been filed under seal and without the filing of any public version.

33.    On February 8, 2016, the Custodian recommended a "Modified Auction" for the Forced Sale of TPG, open to any interested person, including the shareholders.

34.    The Custodian, in recommending the Modified Auction to the Court, acknowledged that it was the most complex and time-consuming of the options presented to the Custodian, and raised the most difficult issues concerning protecting TPG's confidential information.

35.    A modified auction was also the option that would generate the most fees for Pincus, Skadden and the Custodian's other hand-picked advisers, many of whom were clients of Skadden.

36.    Under the Modified Auction, the State of Delaware would take the Shawes' property, their shares in TPG, and transfer them to the highest bidder, unless Pincus and the Defendant determined that Shawe had outbid all bidders for Elting's shares.

37.    Over Shawe's objections, but with Elting's support, the Court adopted Pincus' proposed Modified Auction Forced Sale and adopted his proposed implementing Sale Order verbatim. *In re TransPerfect Global, Inc.,* 2016 WL

3477217 (Del. Ch. June 21, 2016); *id*. 2016 WL 3949840 (Del. Ch. July 18, 2016).

38.    TPG was extremely profitable and had no creditors when the Court ordered the Forced Sale offering the Shawes' property to the highest bidder.

39.    After four rounds of bidding between September and November 2017, Shawe made the highest and best offer, forcing Pincus to concede that Shawe had prevailed in the Forced Sale.

40.    On November 19, 2017, Shawe executed a Securities Purchase Agreement ("SPA") for the purchase of Elting's 50% interest in TPG.

41.    Despite her misrepresentations to the Delaware Courts that she was a legitimate buyer for TPG and that she intended to outbid Shawe, Elting never meaningfully participated as a buyer in the Forced Sale process.  The Custodian ultimately admitted that at no time during the auction process did Elting even make a realistic bid, revealing that, when stripped of its impossible conditions, her ultimate bid actually valued TPG at less than the value represented in the deal presented to her by the Custodian in which her shares would be sold to Shawe and which she rejected as too low back in January 2017.  The Custodian also admitted that, despite never being a realistic bidder, Elting and her partner were never eliminated as a bidder because the Custodian wanted the illusion of multiple bidders in order to promote competition, ostensibly to artificially inflate the final sale price.

42.    Prior to the SPA, Elting consistently sided with the Custodian on

12

virtually all significant decisions concerning the Forced Sale process, consistently supported him on the actions he took as Custodian, and the Custodian consistently opposed Shawe on any significant proposals concerning the Forced Sale to which Elting objected.

43.     Further, the Defendant either sided with the Custodian over Shawe, or refused to address any issues the Shawes presented to the Defendant during the Forced Sale process, with the sole exception of rejecting an unconstitutional, uncompensated, non-competition restriction that Pincus requested the Court unilaterally impose on Shawe in order to make TPG more valuable to third party bidders.

44.     Pincus and the Defendant thereby made clear that any objections by Shawe either to Pincus or to the Defendant concerning Pincus' conduct or actions during the Forced Sale process were or would be futile.

45.     On February 15, 2018, the Defendant upheld the SPA over Elting's objections. *In re Transperfect Global, Inc*., 2018 WL 904160 (Del. Ch. Feb. 15, 2018).

46.     On May 3, 2018, the Delaware Supreme Court ("DSC") rejected Elting's appeal and affirmed the Chancery Court decision. *Elting v. Shawe,* 185 A.3d 694 (Del. 2018).

47.     The sale of Elting's shares in TPG to Shawe closed on May 7, 2018. As

a result, Shawe currently owns 99% of TPG and Shirley Shawe retained her 1% interest.

### The Custodian's and His Advisers' Fees Were Always Sought Against the Pre-Closing Shareholders *Pro Rata* from August 2015 Until May 2019

48.     From the time of Pincus' appointment in August 2015 through the May 7, 2018 Closing, Defendant ordered TPG to pay Pincus, Skadden and his other advisers almost $44.5 million. TPG was ordered to pay Skadden, where Pincus was a partner, over $12,925,000, and TPG was required to pay his other advisers over $31.5 million, including almost $12.4 million to Credit Suisse, a significant client of Skadden appointed by Pincus to act as his advisor on the Forced Sale.

49.     The Defendant never reduced Pincus' monthly fee requests for himself, Skadden or his advisers by so much as a dollar.

50.     Pincus never submitted to the Defendant, Shawe or TPG any documentation to support his and his advisers' monthly fee requests, other than a monthly letter from Pincus stating the total fees and expenses incurred by him and his advisers, and a vague, generalized statement of the types of matters worked on.

51.     Because of the 50/49/1 ownership of TPG until May 7, 2018, the Shawes and Elting effectively each incurred half of these $44.5 million in fees and expenses prior to Closing.

52.     Pursuant to the SPA, a post-Closing $5 million Custodian Escrow Account ("Escrow") was created for post-Closing fees and expenses, funded by the

shareholders, *pro rata*, effectively replicating the pre-Closing 50/49/1 payments from Elting and the Shawes.  *See* SPA § 2.4 (Escrow is "solely for the purpose of securing amounts payable to the Custodian and his advisors"); SPA § 2.2 (the Escrow is for "amounts payable to the Custodian or his advisors, including, without limitation, investment banking, legal and accounting fees and expenses for services performed prior to or after the Closing").

53.    In the event the Custodian does not deplete the Escrow, the remaining funds are to be refunded to the pre-Closing shareholders *pro rata*, per the terms of the SPA.

54.    From the May 7, 2018 Closing through April 2019, the Custodian continued to file confidential monthly fee petitions in which he, Skadden and his advisers sought and were awarded almost $950,000 from the Escrow. The Custodian never submitted any supporting documentation of these claimed fees and expenses.

55.    The Defendant never reduced or discounted any amounts sought in the post-Closing monthly fee petitions.

56.    During this period, the Custodian never sought fees and expenses against TPG directly or from the Shawes, only from the *pro rata* Escrow.

**The Custodian Tries to Charge TPG for His and Skadden's Fees**

57.    In his May 8, 2019 fee petition for April 2019 work, the Custodian asserted that part of the invoice for April work related to two proceedings in which

the Custodian was not a party – an arbitration proceeding in which Shawe was the defendant, *Cypress Partners LLC v. Shawe*, JAMS Ref. No. 1425028705 (the "Cypress Matter"); and an action brought by TPG in Federal Court in New York against a purported bidder in the Forced Sale for, *inter alia*, theft of trade secrets during the Forced Sale process, *TransPerfect Global, Inc. v. H.I.G. Middle Market, LLC and Lionbridge Technologies, Inc.*, 19-cv-3283 (S.D.N.Y. 2019) (the "H.I.G. Matter"). Although billed to the Escrow in April, Pincus asserted that in future fee petitions he intended to seek fees and expenses directly against TPG, not from the Escrow, for any work related to the H.I.G. and Cypress Matters.

58.     In the H.I.G. Matter, non-party Pincus and non-party Skadden received only a standard litigation hold notice. In the Cypress Matter, the Custodian received a subpoena from Cypress, not Shawe, with which the Custodian did not even comply.

59.     Nevertheless, from April to October, 2019, Pincus and Skadden ran up the extraordinary total of almost $250,000 in fees and expenses, all but $26,000 sought directly against TPG for: complying with a standard litigation hold notice; not complying with a subpoena not issued by TPG or Shawe in a matter not initiated by TPG or Shawe; telling two Custodian advisors not to comply with a request from TPG for TPG-related documents in their possession; and partial work opposing a motion for certification of an interlocutory appeal.

60.    In addition to the almost $225,000 sought directly against TPG, the Custodian, Skadden and his tax advisers ran up additional extraordinary fees against the Escrow from April to October of approximately $215,000.

61.    When TPG learned that the Custodian was billing TPG directly, and not the Escrow, for, at least some purported work related to the *Cypress* and *H.I.G* matters, it objected to the Defendant, and demanded to see Pincus' and Skadden's billing records.

62.    TPG also filed an action in Nevada, TPG's place of incorporation, challenging the Custodian's non-compliance with a Director Indemnification Agreement in seeking reimbursement of third-party litigation expenses, and breach of fiduciary duty (the "Nevada Action").

63.    Instead of seeking to dismiss the Nevada Action based on exclusive jurisdiction clauses in the SPA and the February 15 Order, or seeking to adjudicate the propriety of charging fees directly against TPG, rather than the Escrow, the court-appointed Custodian returned to the Court of Chancery and sought the extraordinary remedy of contempt against TPG *and Shawe* for: 1) TPG filing the Nevada Action; and 2) for TPG not paying $65,000 in fees awarded directly against it in orders entered in June and July, 2019 (the "Fee Orders").

64.    In a written order on October 17 and an oral telephonic ruling on October 21, 2019, the Court denied the Custodian's motion for contempt for TPG's

non-payment of fees awarded in the Fee Orders; and 2) granted the motion for contempt for TPG filing the Nevada Action purportedly in violation of an exclusive jurisdiction clause in the Feb. 15 Order.

65.    As a contempt sanction, the Defendant threatened $30,000 daily fines against Plaintiffs if the Nevada Action was not dismissed by October 21, 2019, and awarded Pincus and Skadden their attorneys' fees for the part of the contempt motion that was granted.

66.    Faced with the extraordinary threatened fines, TPG dismissed the Nevada Action on October 21, 2019.

**The Court Orders the Custodian and Skadden to Submit Billing Information, But Imposes A Gag Order, Unconstitutionally Conditioning the Plaintiffs' Access to This Non-Confidential Information on Banning Any Public Disclosure or Comment on the Court-Appointed Custodian's Billings**

67.    In its October 21 telephonic ruling, the Defendant ruled that Pincus and Skadden, for the first time since Pincus' appointment over four years earlier, must provide supporting documentation of its monthly fees and expenses, commencing with the fees and expenses sought directly against TPG in its June fee petition, and for all future fees and expenses sought against TPG or the Escrow, and instructed the parties to submit a proposed implementing order.

68.    The Defendant also concurrently granted all fees sought against the Escrow in the August and September 2019 fee petitions without requiring any

supporting documentation.

69.     Over TPG's and Shawe's objections, the Defendant ruled that such billing information was not only to be filed under seal, to be kept hidden from public scrutiny, but was subject to additional, extraordinary confidentiality provisions, as detailed below.

70.     The parties submitted competing implementing orders, and on November 1, 2019, the Court issued the Nov. 1 Orders—two orders that closely tracked the Custodian's proposed orders: a Second Order Concerning Custodian's Motion for Civil Contempt ("Billing Information Order") *In re TransPerfect Global Inc.*, 2019 WL 5727240 (Del.Ch. Nov. 1, 2019) and a Records Confidentiality Order ("Confidentiality Order") (attached hereto as **Exhibit A**).  Also on November 1, 2019, the Defendant issued a form "Undertaking Acknowledging and Agreeing to be Bound by Records Confidentiality Order," ("Undertaking") (attached hereto as **Exhibit B)** together with the Nov. 1 Orders, (the "Gag Orders").

71.     There is nothing confidential about the court-appointed Custodian's billing information, or in Skadden's billing information on behalf of that court-appointed officer, in which the Court-appointed officer and Skadden seek orders from the Delaware Court of Chancery to force TPG or the Escrow to make payments to the Custodian and Skadden.

72.     Nevertheless, the Gag Orders required that any Skadden/Pincus billing

information must be filed under seal and that all the billing information, including any characterizations of the information must be kept entirely hidden from the public. The Undertaking, by its terms, also severely limits those people even allowed to enter into the Undertaking such that even if Shawe were to execute it, he would be barred from discussing the billing information with his own accountants, advisors, TPG Board members, or even any of his attorneys who have not formally appeared on his behalf in the Delaware action.

73.    Skadden, just like all other law firms that seek fees in Bankruptcy Court, routinely publicly discloses detailed billing information, including the names of the billing attorneys, their rates, the nature of the work performed, the time spent on particular identified tasks, and the attorneys' qualifications in fee applications in the United States Bankruptcy Courts.  Such information is also routinely publicly submitted by other Court-appointed receivers and custodians in the Court of Chancery in the regular course.

74.    Neither Defendant, Pincus nor Skadden provided any reason or facts to support their position that the billing information of the Court-appointed Custodian and his attorneys should be treated differently than other court-appointed receivers, custodians, or Bankruptcy trustees or should otherwise be deemed confidential.  The Gag Orders also do not even require Skadden or Pincus to provide their actual contemporaneous billing records; rather, they may submit "other documentation"

containing only the billing information specified in the Gag Orders.

75.     The Gag Orders also permit the Custodian and Skadden to redact the names of the timekeepers, thereby preventing Plaintiffs from examining the qualifications of the attorneys for the rates they charge.

76.     The Gag Orders also permit the Custodian and Skadden to redact *any* billing information that they deem in "good faith" to be "sensitive," even if not privileged and without any requirement to provide a privilege log or other information that would even put Shawe or TPG on notice that information contained in any provided billing record had been redacted from an original contemporaneous invoice, or why.

77.     The Gag Orders, drafted by the Custodian, contain *pro forma* statements of "good cause" to keep the billing information secret, but the Custodian and Skadden presented no evidence and the Defendant made no findings whatsoever that the billing information in fact contains any confidential information or why such routinely publicly disclosed information by a Court-appointed officer and state actor should be kept confidential.  Defendant also made no findings whatsoever how or why any purported harm from disclosure would outweigh the public interest in access to a court-appointed state actor's billing information that he seeks to recover from a private party.  Defendant further failed to explain why he ignored this predicate requirement of the Court of Chancery Rule 5.1 with respect to documents

filed under seal.

78.     Pursuant to the Gag Orders, *only* TPG's and Shawe's counsel of record in Delaware, TPG's general counsel, Shawe, (and by amendment, *In re TransPerfect Global, Inc.,* 2019 WL 6358786 (Del. Ch. Nov. 29, 2019), an identified expert agreed to by the Custodian), may have access to and review the billing information that Pincus and Skadden choose to provide.

79.     However, in order to have access to and review the billing information, the identified recipients are required to execute the Undertaking.

80.     The Undertaking requires the recipient to agree not to "*disclose, summarize, describe, characterize or otherwise communicate or make available, in whole or in part*, *any"* of Pincus's or Skadden's billing information to any person that has not executed the Undertaking, on pain of court sanctions.

81.     Thus, the only way Shawe or TPG's general counsel can see the billing information for fees that TPG is being forced to pay is to agree to a court-ordered gag on public disclosure of, or even comment of any kind concerning, this non-confidential information.

82.     Both Shawe and TPG's general counsel have refused to execute the Undertaking, because of this unconstitutional court-imposed condition on their constitutional rights to engage in protected speech and the right to petition the government of Delaware for redress of grievances, and so have been prohibited by

Defendant from seeing the billing information, or even generally discussing that information with their counsel, for the fees that Pincus and Skadden are seeking to have Defendant force them to pay.

83.     As a general matter, the public has a strong interest in access to information about fees charged by private attorneys in their capacity as court-appointed state actors and awarded by courts against private companies, especially when the judge has awarded those fees to his former law firm without any oversight of any kind.

84.     This case specifically has been a matter of intense public interest and intense media coverage in the State of Delaware, and the public has a strong interest in this particular case in access to information about fees sought by the Court-appointed Custodian and Skadden against TPG, where such exorbitant "services" were forced unwillingly upon TPG, and were frequently directly adverse to TPG.  In fact, despite the Custodian's inherent obligations to TPG as an attorney, and as the current Court-appointed Custodian of TPG, he has stated, in writing, that he does not believe he owes *any* fiduciary duty to TPG.  As a result, it is unsurprising that some of the Custodian's "services" have been provided solely for the benefit of the Custodian, his counsel, and his other hand-picked advisors, to the detriment of TPG.

85.     Shawe has been outspoken in his criticism of the close and closed relationship between the Court of Chancery and Skadden.  These criticisms have

included the secretive nature of Court of Chancery proceedings, the purported blanket immunity and protections provided by the Court to the Custodian and the total, uncustomary and unnecessary secrecy behind Pincus's, Skadden's and his other chosen advisers' (including major Skadden clients), almost $44.5 million in fees and expenses, which the Defendant, without any oversight, ordered TPG to pay during the Forced Sale, and another $1 million ordered paid by TPG or the Escrow post-Closing through July 2019.

86.     Faced with Shawe's ongoing and effective public criticism, the Defendant's Gag Orders were explicitly designed to prohibit Shawe from publicly criticizing or commenting upon Pincus's and Skadden's claimed fees against TPG as a condition for reviewing them and assisting in his defense against the fees charged.  Because he has been unwilling to submit to Defendant's unconstitutional restraint on his speech, Shawe has been forced to forego review of the fees that Skadden and Pincus continue to charge against TPG, of which Shawe is the 99% owner.

**The November 1 Orders are Non-Final, Interlocutory Orders**

87.     On October 19, 2019, TPG filed a Notice of Appeal in the DSC from the October 17 Order that held Plaintiffs in contempt for filing the Nevada Action.

88.     On October 21, 2019, Shawe filed a Notice of Appeal in the DSC from the October 17 Order that held Plaintiffs in contempt for filing the Nevada Action.

89.     On October 28, 2019, Plaintiffs filed a joint precautionary Motion in the Chancery Court for certification of an interlocutory appeal from the Oct. 17 Order, in the event those Orders were deemed interlocutory.

90.     The Custodian opposed the motion for certification, arguing, *inter alia*, that the Oct. 17 Order was not appealable until the amount of the contempt fees was determined by the Defendant.

91.     On November 12, 2019, Plaintiffs filed a joint Motion in the Chancery Court for certification of an interlocutory appeal from the Nov. 1 Orders, "strictly as a provisional, precautionary matter in the event that the November 1 Orders are determined to be non-final orders."

92.     In that Motion, Plaintiffs specifically identified the improper confidentiality restrictions in the Gag Orders as among the issues for appeal.

93.     On November 18, 2019, the Defendant denied the motion for interlocutory appeal certification of the October 17 Order; did not address Shawe's and TPG's argument that the appeals were final, including under the collateral order doctrine; found the appeals to be interlocutory; and expressly held that further proceedings from the Oct. 17 and Nov. 1 Orders were necessary, including: "(i) the amount of the Contempt Fee Award and (ii) the resolution of any objections Respondents may make to the [June and July 2019] Fee Orders." *In re TransPerfect Global, Inc.,* 2019 WL 6130807, at *5 (Del. Ch. Nov. 18, 2019).

94.     On November 25, 2019, Plaintiffs filed a joint Notice of Appeal in the DSC from the Nov. 1 Orders.

95.     On November 27, Defendant denied the motion for interlocutory appeal certification of the Nov. 1 Gag Orders, relying on its November 18 decision. *In re TransPerfect Global, Inc.,* 2019 WL 6358786 (Del. Ch. Nov. 27, 2019).

96.     Also on November 27, 2019, the DSC issued orders in both appeals to show cause why the appeals should not be dismissed as appeals from interlocutory orders or why the appeals fall within the collateral order doctrine.

97.     In response, Plaintiffs argued that the Oct. 17 and Nov. 1 Orders fell within the collateral order doctrine as final, appealable orders or, alternatively, interlocutory orders that were appropriate for the Supreme Court's review.

98.     In that Response, Plaintiffs specifically identified the improper confidentiality restrictions in the Gag Orders as among the issues for appeal.

99.     On December 31, 2019, the DSC dismissed the appeals. Despite the fact that the Orders will govern fee petitions submitted by the Custodian that have no set end date in the foreseeable future, the Court held that:

> the orders do not fall within the collateral order doctrine. *The orders are not final* and do not have a *substantial, continuing effect on important rights.* As the Court of Chancery recognized, the amount of fees to be awarded to the Custodian pursuant to the First Order is unresolved. Similarly, the parties are currently litigating the appellants' objections to the Custodian's fee petitions, including the petitions that led to the Fee Orders, under the process set forth in the Second Order.

*TransPerfect Global, Inc. v. Pincus*, 224 A.3d 203, at *2 (Del. 2019) (emphasis added).

100. The DSC also rejected "interlocutory review, finding that the "interlocutory appeal" did not meet the standards of DSC Rule 42(b), giving "great weight" to the Defendant's denial of the motion for certification, which had expressly held that further proceedings were necessary in connection with the October 17 and November 1 Orders. *Id.* at *3.

**The Fee Objection Proceedings**

101. To avoid losing the ability to object to the fee petitions, counsel of record for Plaintiffs and an expert retained by TPG's counsel executed the Undertaking, despite the unconstitutional conditions in the Gag Orders.

102. On December 23, 2019, Plaintiffs filed their Objections under seal to the Custodian's June-November fee petitions.

103. Pursuant to Ch. Ct. R. 5.1, and in compliance with the Court's unconstitutional Gag Orders, Plaintiffs proposed to publicly file those portions of the Objections and Exhibits that did not reference the Custodian's or Skadden's billing information.

104. The Custodian, however, demanded that 100% of the Objections and Exhibits must remain hidden from the public, despite the fact that none of that information is, or could even be rationally argued to be, confidential.

105. As a result, Plaintiffs were forced to file a public version that is 100%

blacked out.

106.   As a result of the Custodian's position, 100% of Objections, the Custodian's Opposition, and Plaintiffs' Reply were filed 100% hidden from public view.

107.   The Defendant has not yet ruled on the Fee Objections to the Custodian's fee petitions for May-October 2019 billings, and so the Nov. 1 Gag Orders remain interlocutory, non-final and non-appealable.

108.   The Custodian also purposefully and intentionally refused to submit its claimed fees and expenses in connection with the October 17, 2019 Contempt Order, for the sole purpose of keeping the Contempt Order interlocutory, and non-final, in order to prevent Shawe from appealing the Contempt Order.

109.   On January 23, 2020, Plaintiffs moved to modify or clarify the Nov. 1 Orders so as to allow public disclosure of the non-billing information, while reserving for appeal (if ever permitted by the Delaware Courts) a challenge to the Gag Orders' unconstitutional confidentiality conditions.

110.   On June 8, 2020, Defendant granted the Plaintiffs' motion with modifications, holding that the Gag Orders did not prohibit the disclosure of the *non-billing* information.   Subsequently, the parties filed public versions of the fee objection papers, but with the billing information still redacted and kept hidden from public scrutiny, as previously ordered over Plaintiffs' objections.   The Gag Orders

on any disclosure, comment on, or even characterization of, Skadden's billing information remains in place. Shawe and TPG's General Counsel continue to be prohibited from viewing the billing information unless they agree to the unconstitutional Gag Orders.

111.   In violation of his customary practice from the time of his appointment until November 2019 and several Orders requiring the Custodian to file monthly fee petitions, the Custodian also refused and failed to file fee petitions for purported work done since November 2019, despite having previously conceded that he is required to file the fee petitions monthly. Plaintiffs were forced to file motions in February 2020 that the Custodian had waived his right to fees for those months in which the Custodian had failed to file timely fee petitions as required by court orders.

112.   Only when forced to do so by the Court of Chancery on November 30, 2020, did the Custodian finally submit, on December 15, 2020, his fee petitions and billing records for "services" allegedly performed since October 2019, and his purported contempt-related fees from July to October, 2019.

113.   By letter dated April 13, 2020, the Defendant requested that the parties agree to a confidential mediation without condition, to which the parties agreed. Letters from Counsel for TPG, Shawe, and the Custodian to the Court of Chancery, dated April 15, 2020, confirming that the parties agree to mediation without condition, attached collectively as **Exhibit C**. On April 17, 2020 Defendant stayed

29

the fee waiver motions and fee objections pending the outcome of the mediation.

114. In connection with, and in an effort to facilitate, the mediation, Plaintiffs unilaterally agreed to a "standstill," whereby they would not initiate new actions during the mediation, whether in Chancery or other courts (with the exception of one action with potential limitations concerns). However, on November 30, 2020, although the Mediator continues his work and has not informed the parties that the mediation has been formally terminated, Defendant ordered that the stayed proceedings move forward, thereby necessitating termination of Plaintiff's unilateral standstill.

### Events Subsequent to Filing the Complaint

115. Subsequent to the filing of the original complaint in this action, Defendant has taken a series of actions in an attempt to modify the gag orders that gave rise to this action in an attempt to moot this case and avoid review of his unconstitutional actions.

116. On January 6, 2021, the Chief Judge of the Third Circuit Court of Appeals issued an order transferring this case from Judge Stark of the District of Delaware to Judge Kearney of the Eastern District of Pennsylvania.

117. The following day, Defendant wrote to the parties in the State Court Action requesting the Custodian's position on maintaining as confidential those billing records subject to the gag orders and requesting that the Custodian respond

by January 11, 2021.  Defendant noted that, after review of the original complaint, he *sua sponte* reviewed the billing records at issue, many of which had been filed over 12 months earlier, and that based on that review Defendant was questioning the need for confidentiality, in light of the fact that none of the information contained therein fell inside the scope of "Confidential Information" as that term is defined in Court of Chancery Rule 5.1.

118.   On January 11, 2021 the Custodian responded to Defendant advising that if Defendant believed that it would be preferable to unseal the billing information and amend the gag orders, the Custodian agreed with such action.

119.   On January 13, 2021, Defendant issued an order stating, that in light of the fact a public hearing was scheduled to consider, among other things, the fee petitions to which the sealed billing information pertain, the gag orders were modified to: (1) rescind much of the confidentiality of the Custodian's invoices; (2) rescind restrictions on who could view the billing information; (3) remove the requirement to enter into an undertaking in order to view the billing information; (4) rescind the records confidentiality order and undertaking in the gag orders (except for the exclusivity paragraph requiring any dispute relating to the billing information to be brought in the Delaware Court of Chancery) that prevented TPG and Shawe from viewing or discussing the billing information; (5) rescind the finding of "good cause" for the confidentiality of the billing information; and (6) unseal the billing

information on the case docket.

120.   In response to Defendant's and Custodian's complete reversal of their positions on the confidentiality of the billing information, and because   TPG and Shawe had been deprived of their ability to review the information or participate with their counsel with respect to objections filed to previously filed fee petitions, and Defendant had issued an objection deadline of January 15, 2021 for objection to the Custodian's invoices from July 2019 – November 2020, Plaintiffs filed an emergency motion on January 14, 2021, asking Defendant to modify the scheduling order to cure the due process issues created by the gag orders.

121.   Specifically, Plaintiffs requested adequate time for Plaintiffs: (1) to review and digest hundreds of pages of billing information, and objection briefing and then participate in a supplement to the pending December 23, 2019 objection; and (2) to review, digest, and participate in the objection to hundreds of additional pages of billing information pertaining to the immediately prior 13 months of billing information seeking almost $4 million in fees.

122.   On January 15, 2021, Defendant denied Plaintiffs' motion to modify the scheduling order and found (without any record and despite having rescinded the good cause basis of his earlier orders two days prior and openly asserted that the billing information did not contain "Confidential Information" under Court of Chancery Rule 5.1 the week prior), that: (1) the now-rescinded gag orders were not

a mistake, but were necessary and appropriate; (2) the gag orders had not impeded Plaintiffs' ability to evaluate the fees or participate in the prior objections; (3) no supplement to the prior objection was allowed; and (4) confidentiality had only been removed in light of the upcoming public hearing.  Nonetheless, Defendant proceeded to then modify the schedule to grant Plaintiffs a fraction of the time extended, by moving the January 15, 2021 deadline until January 29, 2021.

123.   Defendant, in a motion filed January 19, 2021, mistakenly claims that he has made this case moot, requiring dismissal.  This action is not moot.  Plaintiffs seek a declaration that the gag orders unconstitutionally impeded upon their Due Process rights and freedom of speech.  Although Defendant may have lifted certain of the confidentiality provisions of the gag orders, Plaintiffs' procedural due process rights were prejudiced and that prejudice remains.  Plaintiffs remain entitled to judgment on their claims because notwithstanding Defendant's actions, Plaintiffs continue to have a "concrete interest" in the outcome of the litigation.  *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).

**Absent a Declaration, Defendant's recent orders threaten to continue to harm Plaintiffs**

124.  Although Defendant's recent orders address the unconstitutional overbreadth of the confidentiality restrictions by removing the confidentiality and prohibit further confidentiality, the orders explicitly continue to maintain that the confidentiality restrictions were appropriate and constitutional as issued and did not

implicate any due process concerns.

125.   As a result, Defendant has created a situation in which the Custodian, a state actor, is requesting that Defendant issue an order that requires Plaintiffs, the parties injured by the unconstitutional speech and due process restrictions, to compensate the Custodian for his fees in seeking, obtaining, and defending Defendant's unconstitutional orders.

126.   The fact that the Defendant continues to maintain that the unconstitutional gag orders were not improper, despite lifting them completely, threatens that Defendant will force Plaintiff TPG to pay the Custodian the hundreds of thousands of dollars that he is demanding that Skadden allegedly incurred concerning the unconstitutional gag orders.

127.   The Custodian currently has petitions pending in front of Defendant seeking orders requiring Plaintiffs to pay the Custodian approximately $4 million dollars for his and his law firms' work. A substantial portion of these fees are directly related to the Custodian's time spent seeking and then defending (and losing) various challenges to the unconstitutional restrictions. Absent a declaration from this Court confirming the unconstitutionality of the confidentiality restrictions, Plaintiffs' challenges to those fees are significantly restricted.

128.   So far, in the four years since the Custodian was appointed, Defendant has granted him more than $14 million and his advisors almost $30 million dollars

in fees and expenses without review of a single document in support those fees, not even an affidavit attesting to their reasonableness, much less an actual invoice. This prior pattern, considered together with the Defendants recent clarification that he considers his unconstitutional actions proper, creates a likelihood that Defendant will soon order Plaintiffs to pay the Custodian, a state actor, some amount in excess of $450,000 for challenging, and prevailing in overturning, the very unconstitutional restrictions the Custodian worked to impose upon them.

129.   Plaintiffs continue to have a legally cognizable interest in a declaration by this Court that the Gag Orders violated their civil rights. Defendant recently found, after rescinding them, that the Gag Orders were necessary and appropriate as implemented. A favorable decision from this Court would force Defendant to reevaluate that determination and provide Plaintiffs a meaningful opportunity to petition the state court for compensatory damages and/or disgorgement of the Custodian's fees for having inappropriately sought unconstitutional relief as a state actor, solely for his own benefit. The Custodian continues to petition Defendant to award millions of dollars in fees, payable by Plaintiffs, to compensate the Custodian for seeking unconstitutional relief and then vigorously defending that position against Plaintiffs' valid challenges.

## FIRST CAUSE OF ACTION
## (FIRST AND FOURTEENTH AMENDMENT VIOLATIONS)

130.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1

through 129 above with the same force and effect as if fully set forth herein.

131.   There has long existed, going back at least 25 years, a broad-based public controversy in the State of Delaware and nationally concerning the operation of the Court of Chancery and its close and symbiotic relationship with certain "Big Law" corporate law firms, particularly Skadden and their high office relations in the politics of Delaware.  *See, e.g., New York Times* (May 23, 1995, Section D, Page 1, National ed. ("Top Business Court Under Fire; Critics Say Politics Is Hurting Delaware Judiciary").  That controversy still exists today.

132.   Among the questions that are raised by that controversy is the unique and symbiotic relationship among the Court of Chancery, the Delaware Supreme Court, and Skadden.  For example, at the time of the appeal from Defendant's Forced Sale Order in 2017, Defendant, the Custodian and the Chief Justice had all been employed as attorneys at Skadden.

133.   Also among the questions that are raised by that controversy is the secrecy with which the Court of Chancery often conducts its processes and procedures, including by use of extensive "protective orders," and sealed pleadings, briefs and evidence, as is typified by the proceedings discussed in this Complaint, *ante*.

134.   In the proceedings in which Plaintiffs have been involved, the Defendant has imposed severe limitations upon public filings.  He has appointed as

Custodian a then-partner at Skadden and provided him with *carte blanche* to act in a manner that maximized the potential and actual fees and expenses he could generate, despite alternative paths to resolve the underlying dispute over TPG that would have been far less expensive, taken far less time, and with equal or better results for the shareholders.

135.   Defendant also granted Pincus a blank check with respect to fees, combined with purported judicial immunity and a complete lack of oversight of any kind.   Armed with these tools, Pincus, Skadden, and other advisors ran up fees of over $46 million through October 2019 by submitting secret invoices, with no billing detail, and no judicial oversight.   To date, Defendant has awarded every penny sought without ever receiving, requesting, or reviewing any supporting documentation, despite objections raised by Shawe and TPG.

136.   Defendant's actions have for many years shielded from disclosure even to the Plaintiffs, much less the public, the billing records in support of the enormous generation of Custodian fees and expenses, and continued to do so long after the underlying dispute was resolved over two years ago, despite the fact that the billing records of the Court-appointed Custodian and his law firm are not confidential under Delaware law or otherwise.

137.   Whatever the propriety or impropriety of such secret arrangements between bench and Skadden, and of Skadden's massive fee generation as court-

appointed officers, the questions indisputably are of public interest and concern, and Plaintiffs have a fundamental constitutional right to air their opinions about the massive fees that the Court has forced them to pay, and may continue to force them to pay.

138.   Plaintiffs also had and have a continuing due process right to see and review the billing detail supporting any fee petitions filed by the Court-appointed Custodian, a state actor, and to be heard on any objections to those fee petitions and billing records before the Defendant may determine whether to grant such petitions in whole or in part, thereby depriving Plaintiffs' of their property.

139.   Until the November 1 Gag Orders were issued, the Defendant's actions denied the Plaintiffs access to the billing information or to object to the petitions based on that information and they were not afforded any practical opportunity to respond to the petitions before Defendant granted them, routinely within a day or two.

140.   After finally recognizing in November 2019, after years of litigation, that Plaintiffs are entitled as a matter of fundamental fairness and due process to obtain disclosure of the Custodian's and Skadden's billing information for its most recent petitions, Defendant has so limited the scope of that disclosure that it constitutes the imposition of an unconstitutional condition upon the Plaintiffs.

141.   Under the Gag Orders, the Court has conditioned the Plaintiffs' right of

access to Skadden's billing information if, and only if, they execute yet another secrecy agreement that would prevent them from any public comment about or disclosure of the Custodian's billing information, including a prohibition on any public characterization of such fees.

142.   Further, any public comments or disclosure would subject the Plaintiffs to sanctions, without regard to whether the comments or disclosures concern any information that is in fact confidential under Delaware law or otherwise.  For example, having not signed the Undertaking, Shawe is currently privy only to the total amounts charged by the Custodian and his advisors.  He is free to publicly opine that the amounts charged by Pincus, Skadden, and his other advisors are outrageous.  However, if Shawe were to sign the Undertaking, that same comment "characterizing" the Pincus and Skadden's invoices would subject Shawe to sanctions, regardless whether his review of the underlying billing information confirmed his opinion that the fees are in fact outrageous.

143.   Such secret and private proceedings deprive the public in Delaware and the nation of information about how the Court of Chancery operates and about its relationships with Delaware law firms, particularly its unusually close relationship with Skadden, thereby understandably undermining public confidence in the Delaware Courts.

144.   Plaintiffs have actively and vigorously participated in the public debate

on such questions and have a First Amendment right to continue to do so.

145.   This case thus presents a classic unconstitutional condition.  Defendant has finally acknowledged the Plaintiffs' rights, or alternatively, extended the benefit of access to, the billing information of the Custodian, and to challenge the Custodian's demand for the payment of fees before the State of Delaware forces TPG to pay such fees to a Court-appointed state actor, and his Court-sanctioned advisers.  However, Defendant has imposed an unconstitutional condition on those rights, or benefit – Plaintiffs can see the billing information, but only if Plaintiffs completely forfeit their First Amendment rights publicly to disclose, speak about, comment upon, or criticize the Custodian's and Skadden's fees. concerning those demands

146.   Thus, Defendant has placed the Plaintiffs into an unconstitutional conundrum – obtain access to the limited billing information required by the Gag Orders before being forced to pay the Custodian's fees, as long as they agree to forego their rights as public citizens to speak, associate and petition the government for redress of grievances on an issue of public concern, on pain of sanctions; or forego altogether their constitutional rights (or the Court-granted benefit) to review the billing information before being forced to pay it.

147.   Indeed, Defendant's imposition of such an unconstitutional condition of secrecy, designed solely to benefit and to protect the Defendant's former firm,

lends further support to those, including the Plaintiffs, who publicly wish to expose and to change the procedures and perhaps even the corruption of the Chancery system in Delaware.  It thus demonstrates the very need for intervention by this Court.

148.   No governmental interest of the State of Delaware or its judiciary is furthered by the Defendant's secrecy condition for this non-confidential billing information, let alone by the strict scrutiny which such a restriction of fundamental First Amendment rights must be measured.

149.   Although Defendant's recent amendments to his orders partially rescind the confidentiality restrictions and address the free speech violations going forward, they do nothing to mitigate the harm caused by the unconstitutional restrictions that has already occurred, nor the ongoing and continuing harm. Plaintiffs are entitled to a determination as to whether the orders violated their civil rights, and in so doing, violated their due process rights in the State Action.

## SECOND CAUSE OF ACTION (VIOLATION OF DUE PROCESS, FOURTEENTH AMENDMENT)

150.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 148 above with the same force and effect as if fully set forth herein.

151.   Plaintiffs have always had and continue to have due process rights to see and to review the billing detail supporting any fee petitions filed by the Court-appointed Custodian, a state actor, and to be heard on any objections to those fee

petitions and billing records before the Defendant may determine whether to grant such petitions in whole or in part, thereby depriving Plaintiffs' of their property.

152.   After being completely denied this due process right since the Custodian's appointment, the Defendant's recent Gag Orders attempt to further condition that constitutional right of access to these billing records and an opportunity to be heard before being deprived of their property on the Plaintiffs' foregoing their First Amendment rights to publicly criticize and to comment upon the Custodian's and his advisors' fee demands, including allowing the public to have access to that court-appointed state actor's billing information for close to $50 million in fees.

153.   This condition in the Gag Orders constitutes an unconstitutional deprivation of Plaintiffs' due process rights, because Plaintiffs lose their constitutional right of access, review and opportunity to be heard on the billing information, unless they surrender their constitutional right to publicly criticize, comment upon and disclose that information.

154.   Defendant's rescission of the unconstitutional gag order and partial lifting of the confidentiality restrictions in an effort to moot this lawsuit did not cure the due process violations or the harm they caused to Plaintiffs.  Defendant denied Plaintiffs' motion asking Defendant to cure the due process harm already caused, and continuing to be caused, by the Gag Orders, ensuring that the harm will not be

adequately addressed by Defendant.  Further, Defendant's repeated affirmation of the validity of the rescinded orders being challenged in this action continues to have a material effect on Plaintiffs' ability to object to the Custodian's Gag Order Fee Petitions in the State Court Action.

WHEREFORE, Plaintiffs demand:

1. A declaration that the condition imposed upon Plaintiffs' right to disclose, criticize, comment upon, or otherwise engage in a frank and open participation in the marketplace of ideas with respect to the actions of the Custodian and the Defendant is an unconditional restriction upon Plaintiffs' free speech and petition rights under the First and Fourteenth Amendments to the Constitution of the United States;

2. A declaration that the due process clause of the Fourteenth Amendment prohibit Defendant from requiring Plaintiffs to pay sums sought by the Custodian for fees and expenses allegedly incurred without being afforded full disclosure of the Custodian's billing information and a full and fair opportunity to respond to and, if appropriate, oppose such petitions, including those petitions for which objections were filed when the confidentiality restrictions remained in place, and (2) that Plaintiffs' exercise of such due process right may not be conditioned on their waiver of their right to disclose, criticize, comment upon, or otherwise engage in

a frank and open participation in the market place of ideas with respect to the actions of the Custodian and the Defendant;

3. If, in the unlikely event that the Defendant ignores this Court's declarations under the First and Fourteenth Amendments, and pursuant to the Supremacy Clause of the Constitution of the United States, a preliminary and final injunction requiring the Defendant to permit Plaintiffs to have access to the Custodian's original and unaltered billing records for amounts sought by the Custodian from TPG or the escrow, with no attendant condition or threat of consequences.

4. An award of Plaintiffs' reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

5. Such other and further relief as the Court deems just and proper.


**EICHER LAW LLC**

 /s/Jeremy D. Eicher
Jeremy D. Eicher, Esquire (I.D. # 5093)
The Nemours Building
1007 North Orange Street, 4th Floor
Wilmington, Delaware  19801
Telephone: (302) 299-0959
jeicher@eicherlaw.com
*Attorneys for Plaintiff Philip R. Shawe and TransPerfect Global Inc.*

Co-Counsel:

Eric M. Lieberman, Esquire
RABINOWITZ, BOUDIN, STANDARD,

44

KRINSKY & LIEBERMAN, P.C.
14 Wall Street, Suite 3002
New York, New York 10005
(212) 254-1111
elieberman@rbskl.com

and

Alan Dershowitz
1575 Massachusetts Ave.
Cambridge, MA, 02138
 (617) 319-9882
*Attorneys for Plaintiff Philip R. Shawe and*
*TransPerfect Global Inc.*


Dated:  February 9, 2021